In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2941

INDIANA FAMILY & SOCIAL SERVICES
ADMINISTRATION, and OFFICE OF MEDICAID
POLICY AND PLANNING,

Plaintiffs-Appellants,

and

ELECTRONIC DATA SYSTEMS CORPORATION,

Intervening Plaintiff-Appellant,

v.

TOMMY G. THOMPSON, Secretary of the
United States Department of Health & Human
Services, and NANCY-ANN MIN DEPARLE, Administrator,
Health Care Financing Administration,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 99-1168-C H/G--David F. Hamilton, Judge.

Argued January 23, 2002--Decided April 12, 2002


 Before BAUER, COFFEY, and EVANS, Circuit
Judges.

  EVANS, Circuit Judge.  Indiana, through
its Department of Family & Social
Services (DFSS)/1 and Office of
Medicaid Policy and Planning (OMPP),
adopted a new management information
system for processing Medicaid claims.
The Health Care Financing Administration
(HCFA), now known as the Centers for
Medicare and Medicaid Services (CMMS), of
the United States Department of Health &
Human Services (DHHS) rejected Indiana's
claim for an enhanced level of federal
funding for the system. Indiana appealed
to the DHHS Departmental Appeals Board
(DAB), which affirmed the disallowance.
After Indiana petitioned for judicial
review, the district judge granted
summary judgment to the Secretary.
Indiana appeals the decision to us.

  Medicaid, as everyone knows, is a

cooperative state-federal program designed to provide medical assistance to poor people. Although each state administers its own program, states with plans approved by the federal government are entitled to receive federal matching funds, referred to in administrative lingo as Federal Financial Participation (FFP). Federal money is available to pay for medical services at a rate based on a state's per capita income. It is also available to share the state's administrative expenses, generally at a 50 percent rate. In 1972, to encourage states to use modern computerized systems to process Medicaid claims, Congress passed legislation establishing enhanced rates of funding. The law provides that the federal government will pay 90 percent of costs attributable to the "design, development, or installation of . . . mechanized claims processing and information retrieval systems." 42 U.S.C. sec. 1396b(a)(3)(A)(i). It will also pay 75 percent of costs "attributable to the operation" of the system. 42 U.S.C. sec. 1396b(a)(3)(B). The system must meet the requirements for a Medicaid Management Information System (MMIS), as certified by DHHS, in order to receive enhanced FFP funding.

In 1993 Indiana decided to replace its existing Medicaid information system. It contracted with Electronic Data Systems (EDS) to design and implement the Advanced Information Management System (AIM). AIM was designed to process electronic as well as paper claims and offered enhanced editing and auditing features over the old system.

Some of the claims slated to come through AIM were Medicare crossover claims, which are ones that concern people eligible for both Medicare and Medicaid (i.e., people who are elderly in addition to being poor). Such claims are processed first through Medicare and then "cross over" to Medicaid for further coverage (usually of Medicare co-payments and deductibles). To process a crossover claim, AIM required both a medical provider's Medicare and Medicaid provider numbers because it cross-referenced the Medicare number with the Medicaid number in order to pay the proper Medicaid provider. In January of 1994, while preparing to implement AIM, Indiana mailed Medicaid re-enrollment

applications to medical providers. According to Indiana, many providers gave incorrect Medicare provider numbers or failed to supply a number at all.

AIM "went live" on February 5, 1995. Either shortly before or shortly after this date, Indiana determined that a high number of crossover claims were being or would be rejected because of the problem with the missing provider numbers. Indiana decided to suspend the claims in order to track down the missing Medicare provider numbers in its database. To aid this process, it routed electronic crossover claims into "location 41," a separate electronic file within AIM.

AIM weekly status reports for May 1995 showed a growing backlog of electronic crossover claims. As of the week ending May 12, Indiana had loaded all crossover tapes onto AIM,/2 but there were still 164,000 claims to be processed for the first time; by May 19 that number was 167,000; by May 26 it was 184,000; by June 2 it was 211,418; by June 9 it was 230,000; by June 16 it was 250,000. This backlog was processed in full the week ending June 23.

After an on-site certification review of AIM in August 1996 and some back and forth with Indiana, HCFA reached a final decision in December of 1997 that AIM's certification date would be November 21, 1995, not February 5, 1995. The difference in dates represented $5,880,230 in decreased funding. Indiana appealed the disallowance to the Departmental Appeals Board. While the appeal was pending, Indiana and HCFA discussed the reasons why AIM was not certified as of February 5. In May of 1998, HCFA revised its decision, holding that June 23 was the proper certification date because as of that date AIM was processing electronic Medicare crossover claims on "a normal flow basis."

The DAB upheld HCFA's rejection of a February 5 certification date but moved the certification date up a week from June 23 to June 17, or from the end to the beginning of the week when the backlog was processed./3 The DAB first noted that "a decision to withhold the processing" of electronic crossover claims "because of problems in securing Medicare provider numbers . . . is not

grounds for certifying Indiana's system as of February 5, 1995." AIM could not be "fully functional" without this "critical information." The DAB also wrote that "the AIM system had more problems than just the missing provider numbers." But "[r]egardless of the cause," the evidence established that AIM was not "continuously processing electronic crossover claims" until it started processing the backlog on June 17. The fact that AIM may have processed some electronic Medicare crossover claims in February and possibly in March 1995 was insufficient to show that AIM was "operating continuously" in light of the backlog.

Indiana filed a petition for judicial review in the district court. EDS was allowed to intervene as Indiana indicated that it might look to it to recover damages. The parties moved for summary judgment and the district judge ruled in the Secretary's favor, noting that "the cause of the problem does not matter" because the DAB had not tried "to resolve those issues definitively." Rather, the DAB had evaluated "actual performance" in interpreting the "operating continuously" standard. The DAB did not act arbitrarily or capriciously in finding "that processing a small fraction of a particular type of claims, and then suspending all processing of such claims for several months, did not satisfy the requirement of 'operating continuously, processing all claims types.'"

We recall that the relevant statute provides that the federal government will pay 75 percent (remember the normal administrative rate is 50 percent) of expenses attributable to the "operation" of an approved information system. 42 U.S.C. sec. 1396b(a)(3)(B). The relevant regulation requires that the system has been "operating continuously during the period for which" enhanced funding is claimed. 42 C.F.R. sec. 433.116(d). Another regulation, 42 C.F.R. sec. 433.110(a)(1), directs the reader to HCFA's State Medicaid Manual (SMM) for additional guidelines. The manual requires that the "complete system with all its component subsystems . . . has been operating continuously, processing all claims types, during all periods for which 75 percent FFP is claimed." SMM sec. 11210.

We have had some skirmishing about the relevant standards of review. Although we review a district court's ruling on a motion for summary judgment de novo, Mt. Sinai Hosp. Med. Ctr. v. Shalala, 196 F.3d 703, 707 (7th Cir. 1999), judicial review of the DAB's determination is made under 5 U.S.C. sec. 706, which requires that we uphold the Secretary's determination unless he made "an arbitrary or capricious decision, abused [his] discretion, acted contrary to law or regulation, or lacked the support of substantial evidence." Mt. Sinai, 196 F.3d at 708 (citations omitted).

Also at issue is the deference accorded the Secretary's interpretation of the SMM in the wake of United States v. Mead Corp., 121 S. Ct. 2164 (2001). Mead, which was decided 2 months after the district judge's ruling in this case, makes clear that not all agency interpretations of its own laws are entitled to full Chevron deference. Only those subject to notice-and-comment or comparable formalities qualify. Id. at 2172-73; United States Freightways Corp. v. Commissioner, 270 F.3d 1137, 1141 (7th Cir. 2001). Less formal agency interpretations, including those in agency manuals, receive "more flexible respect," Freightways, 270 F.3d at 1141, depending on the agency's care, consistency, formality, relative expertness, and the position's overall persuasiveness. Mead, 121 S. Ct. at 2171, 2175.

Indiana finds nothing objectionable in the manual itself but instead challenges what it calls the "Secretary's ad hoc interpretation" of the manual. Indiana asserts that it made a deliberate decision to "suspend" electronic crossover claims (by routing them into location 41) so it could obtain or reconcile Medicare provider numbers./4 By denying its claim for funding, the Secretary improperly interpreted "processing" not to include the suspension of claims for information verification and error correction. The Secretary instead interpreted "processing" as synonymous with "paying." Indiana asks us not to defer to this interpretation because it is nonsensical and conflicts with a manual provision requiring that a "claims processing

subsystem" must "[a]utomatically suspend all transactions in error until corrections are made." SMM sec. 11325.

Indiana doesn't have the facts to pull off this argument. AIM was never in the business of identifying erroneous crossover claims and sending them to location 41 in order to allow Indiana to obtain missing provider numbers for those claims. Shortly after the "live" date, AIM began rejecting electronic crossover claims that lacked provider numbers. After edits were made, all electronic crossover claims were sent to location 41, regardless of whether they were missing information or not. As Judge Hamilton in the district court aptly put it, "[E]ven those providers who had correctly provided all necessary information had their claims for payment put on ice until the week beginning June 17, 1995."/5 Thus, the issue for us is not whether the Secretary was wrong to find that processing does not include claim suspension for error correction. The DAB made no such determination. The relevant issue is whether we should upset the Secretary's conclusion that AIM's segregation of all electronic crossover claims, whether they contained errors or not, meant that AIM was not "processing" the claims.

Although neither the manual nor the governing regulation defines "processing," we think the Secretary did not err by concluding that "processing" does not entail segregating an entire class of claims without regard to whether individual claims within the class were valid or not./6 Indeed, we need look no further than Indiana's own brief to find support for this interpretation. It states:

[W]hat the phrase must mean is that a system that receives claims for payment must either process the claim for payment, deny the claim because it does not meet certain requirements, or suspend the payment of the claim to obtain additional information in order to ensure that the claim is properly adjudicated.

Later it adds:

The Medicaid Manual can only be interpreted as saying that the system must have the capability for having all

types of claims processed, including identifying the claim when received, assigning a control number, paying the claim when it is warranted, suspending the claim when further development is necessary, and then either paying or denying the claim for payment (both italics added).

These definitions presume that the act of processing requires a system "to separate non-compliant claims for further review" (more of Indiana's words). Indiana hasacknowledged the obvious--that warehousing all claims of a particular type, regardless of whether some are valid, means that the system is not performing an essential part of processing by sorting the good from the bad, correcting the bad, and allowing the good to go forward.

This meaning is consistent with the manual and the regulation. We'll start with the requirement that a system "suspend all transactions in error until corrections are made." SMM sec. 11325. Even assuming that all of the crossover claims lacked the requisite information, Indiana did not suspend each transaction because of this error. Rather, it sequestered the entire group of electronic crossover claims to address the problems bedeviling what it suspected would be the majority of the claims. Moreover, AIM may well have suspended claims that were not in error by withholding payment on claims that may have contained correct information. It is a consistent reading of the "suspension" guideline to infer that claims not in error be allowed to proceed to payment. After all, the objectives of the MMIS are "[m]ore accurate and timely claims processing" and "[r]educed time to pay providers." SMM sec. 11115. Another guideline requires the claims processing subsystem to "[e]nsure that reimbursements to providers are rendered promptly and correctly." SMM sec. 11325. Moreover, the governing regulation requires "continuous" operations. 42 C.F.R. sec. 433.116(d). We doubt that a physician who submitted a valid electronic crossover claim, but had to wait months for payment because of problems with claims submitted by other providers, would think that AIM was busy "processing" crossover claims. The Secretary acted consistently with his

statutory authority by adopting an interpretation of processing that encourages states to pay valid crossover claims efficiently, thereby encouraging physicians to provide medical services to the elderly and poor, which is, putting all this administrative mumbo jumbo to the side, the whole point of Medicare and Medicaid./7

The Secretary filled this gap with sufficient care and formality to warrant deference. HCFA performed its initial certification review in August of 1996. Even after it disallowed enhanced funding, it negotiated with Indiana at length before revising its original decision. The DAB weighed the evidence submitted in this case and, in a thorough opinion, upheld HCFA's decision. The Secretary has a familiarity, expertise, and institutional memory concerning the intricacies of Medicaid processing systems and funding standards that we cannot rival. The Secretary did not reach the conclusion in this case, as Indiana contends, in an "ad hoc" fashion.

And there is another ground for upholding the Secretary. Even assuming that AIM identified and withheld only those claims lacking provider numbers, the resulting backlog was substantial. The DAB found that the provider numbers were "critical information" for AIM's functioning and "[t]he responsibility to procure this information in a timely manner to ensure the full and continuous operation of the AIM system rested with Indiana."

Indiana has not challenged this finding, which we think is also entitled to deference. Indeed, it is not only consistent with but appears to be compelled by the manual. The manual provides that "the federally required MMIS" has six "core subsystems," one of which is "claims processing." SMM sec. 11310. The manual specifies that the claims processing subsystem must "[v]erify that all providers submitting input are properly enrolled." SMM sec. 11325. There is also a "provider" subsystem. SMM sec. 11310. The provider subsystem must "[p]rocess provider applications and changes in a timely manner and maintain control over all data pertaining to provider enrollment" and "[b]uild and maintain a computerized file

of provider data for claims processing." SMM sec. 11320. It is not inconsistent to read this requirement as encompassing Medicare provider numbers since the MMIS seeks "[c]ompatibility with Medicare claim processing and information retrieval systems for the processing of Medicare claims." SMM sec. 11115. And the Manual makes clear that the "complete system with all its component subsystems" must be "operating continuously, process ing all claims types, during all periods for which 75 percent FFP is claimed" (italics added). SMM sec. 11210.

This interpretation is also persuasive. Common sense alone dictates that in order for an information system to operate, it must be technically functional and also have access to the input required to perform its tasks. Otherwise the goal of using the system to process claims effectively will not be achieved, as in this case where a backlog of a quarter of a million crossover claims developed. Interpreting the manual to require a state to ascertain necessary information does not discourage states from developing mechanized systems to process Medicaid claims. The federal government still provides 90 percent of the costs attributable to the "design, development, or installation" of these systems. Because the 75 percent level applies to a system's "operation," the Secretary can justifiably expect that a system will not only be technically operational but also possess the requisite information to enable the system to hum.

In sum, although Indiana complains that it confronted a "no win" situation in that it had to choose between submitting electronic crossover claims that would be rejected (which would have caused HCFA to deny funding) or suspending the claims (which led HCFA to deny funding), Indiana continues to ignore the critical decision it made earlier to "go live" with AIM before its provider database was complete. As Dorothy Collins, HCFA's regional administrator, wrote to Kathleen Gifford (with Indiana):

The problems which caused the delay in processing these claims should have been anticipated and addressed before the system "went live." Federal Financial Participation (FFP) would have been available at the 90 percent rate for the

additional costs involved in anticipating and addressing crossover processing problems as well as all the other problems which arose when the AIM system was turned on.

Whether Indiana would have been entitled to the 90 percent rate for fixing its database issue is not clear. What is clear is that instead of postponing AIM's debut, Indiana jumped the gun. We find nothing wrong with the Secretary's decision to hold Indiana to the consequences of that choice. The judgment of the district court is AFFIRMED.

FOOTNOTES

/1 Acronyms are a staple of court decisions, especially in cases like this one involving bureaucratic behemoths. So we won't go light on the acronyms, as we'll first use "DFSS" for the Department of Family & Social Services. Later we'll introduce "OMPP", "HCFA", "CMMS", "DHHS", "DAB", "FFP", "EDS", "AIM", and "SMM".

/2 The mechanics of how electronic crossover claims were loaded into the system are a mystery to us. Indiana apparently received tapes that contained crossover claims. As near as we can determine, AIM was able to load the tapes into the system but could not process the claims contained on them.

/3 The DAB reminded HCFA that it had not reduced the $5,880,230 figure after the first revision, so the amount at issue was unclear. At oral argument, counsel told us that slightly over $2 million still hangs in the balance.

/4 We will assume for purposes of this appeal that AIM's problems were attributable solely to missing Medicare provider numbers. The parties strenuously debated, however, the exact cause of AIM's problems before the DAB, which specifically found that AIM had systemic problems.

/5 It is hard to tell whether Indiana contests this fact. Although Indiana's submissions at various levels of this dispute have at times suggested that Indiana suspended only erroneous claims, the record evidence indicates otherwise. See Mary Simpson aff. para. 8 ("Indiana . . . made a conscious decision to withhold the processing of Medicare crossover claims for up to six (6) months."); Pat Nolting aff. para. 7 ("In February 1995, a conscious decision was made . . . to withhold processing of Medicare crossover claims. . . . [H]ad all Medicare crossover claims been processed in February 1995, there would have been

a large number of rejected claims which would have required resubmittal by providers."). Indiana claims that it processed electronic crossover claims in March of 1995. The DAB properly found that there was no evidence to support that assertion.

/6 Indiana invokes definitions for "data processing" and "automatic data processing" that appear in federal regulations. These definitions are so generic that we think they fail to illuminate the narrower issues raised in this case.

/7 Indiana has made much of the fact that it ultimately processed the backlogged claims within the 6-month time frame for crossover claims allowed by 42 C.F.R. sec. 447.45(d)(4)(ii). But the governing regulation for enhanced funding (which Indiana does not challenge) requires "continuous" operation. 42 C.F.R. sec. 433.116(d). A substantial backlog of electronic crossover claims developed in the spring of 1995. So the fact that Indiana may have been able to adjudicate the crossover claims under the most generous wire does not show that it was doing so continuously in light of the fact that it sidetracked the claims for some time.